MICHAEL ROBINSON-DORN (CA Bar No. 159507)
UC IRVINE SCHOOL OF LAW
ENVIRONMENTAL LAW CLINIC
P.O. Box 5479
401 East Peltason Dr.
Irvine, CA 92616-5479
T: (949) 824-1043
E: mrobinson-dorn@law.uci.edu
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE NATIVE AMERICAN LAND CONSERVANCY and NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>        Plaintiffs,<br><br>   v.<br><br>DEBRA HAALAND, Secretary of the Interior, in her official capacity; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND MANAGEMENT; NADA WOLFF CULVER, Senior Advisor to the Secretary of the Interior, exercising the delegated authority of the BLM Director; KAREN MOURITSEN, BLM California State Director; ANDREW ARCHULETA, District Manager for BLM California Desert District; MICHAEL AHRENS, Field Manager for BLM Needles Field Office; in their official capacities,<br><br>        Defendants. | **CASE NO. 5:21cv-00496**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      In this case, the Native American Land Conservancy ("NALC") and National Parks Conservation Association ("NPCA") challenge an illegal action taken by the Bureau of Land Management ("BLM") in the waning days of the Trump administration. BLM disregarded its responsibilities under the law to meaningfully review the impact of its actions on the environment, and cultural and historic treasures in the Mojave Desert. That disregard benefited Cadiz Real Estate, LLC—a wholly-owned subsidiary of the for-profit entity Cadiz, Inc.—at the expense of ecological, cultural, and historic resources.

2.      In late December 2020, BLM assigned a preexisting right-of-way under the Mineral Leasing Act to Cadiz Real Estate, LLC. Concurrently, BLM granted the company a new right-of-way under the Federal Land Policy and Management Act ("FLPMA"). These decisions allow for Cadiz Real Estate, LLC to transport water through an existing 64-mile gas pipeline, that runs across federal lands from Cadiz to Wheeler Ridge (the "Northern Pipeline").

3.      The Northern Pipeline is a key component of the controversial Cadiz Valley Water Conservation, Recovery and Storage Project ("Cadiz Project"), a scheme through which Cadiz, Inc. hopes to mine and sell billions of gallons of groundwater annually from an ancient desert aquifer system underlying the surrounding Mojave Trails National Monument, Mojave National Preserve, and other protected areas. The drawdown of this aquifer will seriously damage the groundwater dependent ecosystem in these protected areas, including rare freshwater springs, seeps, and riparian areas, that represent both

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

sensitive ecological units and important cultural resources that Native Americans have used since time immemorial.

4.     To date, the Cadiz Project's plan, to mine 50,000 acre-feet (roughly 16 billion gallons) of water per year from the driest desert in North America, has escaped meaningful federal review of its potentially catastrophic impacts. Despite calls for a Federal review of the Cadiz Project from a sitting U.S. Senator (Senator Dianne Feinstein), warnings of the Cadiz Project's potential harms from the National Park Service and the California Department of Fish and Wildlife, and an assessment from the U.S. Geological Survey—in which the USGS found that the Cadiz Project's estimates of water recharge rates were "not defensible," and in excess of the actual rate by 5 to 25 times—the absence of meaningful Federal review of the Cadiz Project's impacts persists. Memorandum from James F. Devine, Senior Advisor for Sci. Applications, U.S. Geological Surv., to Molly S. Brady, Needles Field Manager, Bureau of Land Mgmt. 2 (Feb. 23, 2000) (finding Cadiz, Inc. overestimated the natural groundwater recharge to the basin by 5 to 25 times) (attached as Attachment 1); *see* Letter from Charlton H. Bonham, Dir., California Dep't of Fish and Wildlife, to Scott S. Slater, Chief Exec. Officer, Cadiz, Inc. 1, 6 (Dec. 4, 2018) (attached as Attachment 2); Letter from Stephanie R. Dubois, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Tom Barnes, Env't Sci. Assocs. 1-5 (Feb. 13, 2012) (attached as Attachment 3); Letter from Mary G. Martin, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Dirk Reed, Project Manager, Metropolitan Water Dist. 1-2 (Feb. 28, 2000) (attached as Attachment 4).

5.      In the post-2020-election scramble to authorize a right-of-way under FLPMA for the Cadiz Project's Northern Pipeline, before the looming transfer of presidential power, BLM fast-tracked the normal review process, granting Cadiz's requests with a haste that vitiated necessary compliance with the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA").

6.      In defense of its actions, BLM asserted that the requested right-of-way for the Northern Pipeline was "not linked to the use of the groundwater under private lands held by Cadiz"—an assertion belied by the facts, and by Cadiz's own statements.

7.      In a November 5, 2020 filing with the Securities and Exchange Commission ("SEC") about the Cadiz Project, Cadiz, Inc. discussed the Northern Pipeline. In that filing, Cadiz, Inc. stated that "the [Northern Pipeline] could diversify delivery opportunities for the Water Project and our broader water resource development efforts." That statement directly contradicts the BLM's contention that the Northern Pipeline is "not linked" to the pumping of groundwater by the Cadiz Project.

8.      In that same filing, Cadiz, Inc. also stated "testing resulted in a determination that there were no residual petroleum products in the tested segment [of the Northern Pipeline] and that the pipeline is structurally sound to transport water between Cadiz and Barstow." Cadiz, Inc.'s statement directly contradicts the BLM's later refrain that "[d]etails of the eventual use of the ROW are not yet defined and will be considered in a separate decision at a later date."

*///*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

9. According to BLM, the "[right-of-way] would not authorize any modification, construction, or other ground disturbing activities." There is, however, no guarantee that the Northern Pipeline cannot be used for water conveyance without any further "modification, construction, or other ground disturbing activities," and that would require no further authorization or review from BLM for said pipeline.

10. The NALC and NPCA bring this action against the U.S. Department of the Interior ("Interior"), BLM, and the appropriate public officials (collectively referred to as the "Defendants"), to challenge the BLM's December 21, 2020, grant of a FLPMA Title V right-of-way to Cadiz Real Estate, LLC. Defendants granted that right-of-way without conducting the reviews required by, and with profound disregard for consultative processes embedded in, the NHPA and NEPA—all in violation of the Administrative Procedure Act ("APA").

11. Defendants erroneously rely on the applications of an NHPA B-8 categorical exemption and a NEPA E-12 categorical exclusion to avoid compliance with federal review requirements of the NHPA and NEPA. In so doing, and in derogation of their obligation to properly manage the public lands under FLPMA, Defendants disregarded objections from the NALC and NPCA citing procedural violations regarding, inter alia, BLM's Section 106 consultation responsibilities under the NHPA, and the presence of extraordinary circumstances warranting the preparation of an Environmental Impact Statement ("EIS") under NEPA.

12. Accordingly, Defendants have failed to abide by their statutorily required duties under the NHPA, NEPA, and FLPMA.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

13.    The NALC and NPCA have been, and will be, directly harmed by BLM's improper grant of a right-of-way for the Northern Pipeline to Cadiz Real Estate, LLC., including by Defendants' failure to follow the required review processes under the NHPA and NEPA.

14.    For these reasons and those set forth below, the Defendants' grant of a FLPMA Title V right-of-way to Cadiz Real Estate, LLC is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and "without observance of procedure required by law," within the meaning of the judicial review provision of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2).

15.    Accordingly, this Court should: (1) find and declare the BLM's right-of-way grant to Cadiz Real Estate, LLC to be contrary to law, and that the BLM's review process of the Northern Pipeline right-of-way application violated the APA, NHPA, NEPA, and FLPMA; (2) vacate the BLM's decision to grant the right-of-way to Cadiz Real Estate, LLC, and remand the matter to BLM for further actions consistent with the law; and (3) enjoin Defendants from authorizing or otherwise allowing any operation, conversion, or modification of the Northern Pipeline for water transport to proceed until Defendants fully comply with all obligations under federal law, including the NHPA, NEPA, and FLPMA.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (civil action in which claims arise pursuant to a federal question) and 28 U.S.C. § 1346 (United States as a Defendant). An actual and justiciable controversy exists, and the

1  claims arise under the APA, which together with the Declaratory

2  Judgment Act provides remedies against the Defendants' actions,

3  including injunctive and declaratory relief.

4      17.    Venue is proper in this Court pursuant to 28 U.S.C. §

5  1391(e)(1)(A) because this is an action in which the Defendants are

6  officers and employees of the United States acting in their official

7  capacities and some of the Defendants reside in this judicial district.

8      18.    Venue is also proper in this Court pursuant to 28 U.S.C. §

9  1391(e)(1)(B) because a substantial part of the events or omissions

10 giving rise to this claim has occurred within this judicial district. The

11 BLM's decision to grant Cadiz Real Estate, LLC the right-of-way was

12 issued and authored by the BLM Field Manager in Needles, CA.

13 Therefore, the decision was made in Needles, CA.

14     19.    Venue is also proper in this Court pursuant to 28 U.S.C. §

15 1391(e)(1)(B) as a substantial part of property that is the subject of the

16 action is situated within this judicial district.

17 **PARTIES**

18     20.    Plaintiff **Native American Land Conservancy** ("NALC")

19 is a non-profit organization headquartered in Coachella, CA, whose

20 mission is to acquire, preserve, and protect Native American sacred

21 lands through protective land management, educational programs, and

22 scientific study.

23     21.    The NALC restores sacred sites and provides educational

24 programming for Native American youth and the general public,

25 focusing on the traditional territory of Native Americans in present day

26 Southern California. The NALC works to protect numerous cultural

sites within the California desert including the 2,560 acres known as the Old Woman Mountains Preserve, which falls within the boundaries of the Mojave Trails National Monument. The NALC also stewards Coyote Hole, another property of cultural significance to Native Americans in the area, located on the outskirts of Joshua Tree, CA.

22.     The NALC has been, is, and will continue to be, adversely affected and irreparably injured by the Bureau of Land Management's decision to exempt the Northern Pipeline from required consultation, review, and analysis under the National Historic Preservation Act. The BLM's decision to apply a Class B exemption impermissibly narrowed the scope of the undertaking that should be reviewed, which adversely affects resources of cultural significance by depleting sacred water resources. This injury is both concrete and particularized.

23.     From time immemorial, Native Americans have depended on the resources of the area impacted by the Northern Pipeline right-of-way and the associated Cadiz Project—the wildlife, plants and water— for their cultural survival. The desert region is a sacred landscape punctuated by landmarks held in reverence by the Cahuilla, Chemehuevi, Mojave, Serrano, and Southern Paiute peoples. The seeps, springs, and water sources found in the mountains and low desert represent a connected landscape found in story, song, and ritual through the Salt Song Trail of the Chemehuevi and Southern Paiute Tribes. In addition, transmission of Native American knowledge and language through the generations depends critically on these sacred ancestral landscapes, as do the cultural rights and way of life of local Native Americans.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

24.     The interests of the NALC's supporters, described above, will be injured not only by the adverse impacts to plants and wildlife associated with modification, operation, and maintenance of the Northern Pipeline, but also by the expected drawdown of the Fenner, Bristol, and Cadiz basins that will result from operation of the Cadiz Project. *See* Letter from Charlton H. Bonham, Dir., California Dep't of Fish and Wildlife, to Scott S. Slater, Chief Exec. Officer, Cadiz, Inc. 1, 6 (Dec. 4, 2018) (attached as Attachment 2); Letter from Stephanie R. Dubois, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Tom Barnes, Env't Sci. Assocs. 1-5 (Feb. 13, 2012) (attached as Attachment 3); Letter from Mary G. Martin, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Dirk Reed, Project Manager, Metropolitan Water Dist. 1-2 (Feb. 28, 2000) (attached as Attachment 4); Memorandum from James F. Devine, Senior Advisor for Sci. Applications, U.S. Geological Surv., to Molly S. Brady, Needles Field Manager, Bureau of Land Mgmt. 2 (Feb. 23, 2000) (finding Cadiz, Inc. overestimated the natural groundwater recharge to the basin by 5 to 25 times) (attached as Attachment 1).

25.     The NALC's mission has been, is, and will continue to be frustrated by the BLM's decision to exempt the grant of a right-of-way for the Northern Pipeline from review under both the NHPA and NEPA. The NALC's supporters have and will take personal trips for cultural, religious, and educational purposes to Bonanza Spring, the Cadiz Dunes, and other areas that will be affected by the construction, operation, and maintenance of the Northern Pipeline. This injury is both concrete and particularized.

26. The NALC's supporters have visited freshwater springs near the Cadiz Project site, including Bonanza Spring, to use and tend to them sustainably since time immemorial, and they intend to continue to do so in the future. The NALC's supporters derive cultural, religious, and educational enjoyment from the natural ecosystems that these desert springs and other riparian areas support. Native Americans have special and deep-rooted traditional relationships with the water that has sustained them. Those interests will be harmed by the drawdown of these springs because the NALC's supporters will no longer be able to interact with these natural ecosystems.

27. The NALC also helped to author and pass a resolution before the National Congress of American Indians ("NCAI") opposing the Cadiz Project. On November 13, 2020, the NCAI unanimously passed Resolution PDX-20-032: Opposition to Water Projects, such as the Proposed *Cadiz Valley Water Conservation, Recovery and Storage Project* in the Mojave Desert, that will Impact Sacred Cultural Rights and Natural Resources that are Critical to Tribal Nations. National Congress of American Indians, *Opposition to Water Projects, such as the Proposed* Cadiz Valley Water Conservation, Recovery and Storage Project *in the Mojave Desert, that will Impact Sacred Cultural Rights and Natural Resources that are Critical to Tribal Nations*, PDX-20-032 (2020) (attached as Attachment 5). The NCAI was established in 1944 and is the oldest and largest national organization of American Indian and Alaska Native tribal governments.

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

28.     The NALC has been, is, and will continue to be required to divert its organizational resources to monitor the Northern Pipeline to ensure that the process delineated in the May 2019 *State Protocol Agreement Among the California State Director of the Bureau of Land Management and the California State Historic Preservation Officer and the Nevada State Historic Preservation Officer Regarding the Manner in Which the Bureau of Land Management Will Meet its Responsibilities under the National Historic Preservation Act and the National Programmatic Agreement Among the State Historic Preservation Officer*s ("Protocol") is followed, such that there is a proper consultation with the State Historic Preservation Officer as required by the Protocol and the NHPA. This injury is both concrete and particularized.

29.     Plaintiff **National Parks Conservation Association** ("NPCA") is a nonpartisan, non-profit advocacy organization headquartered in Washington, D.C., whose mission is to provide an independent voice for protecting and enhancing America's National Park System for present and future generations. NPCA has nearly 1.4 million members and supporters nationwide. Among its many regional and field offices, NPCA operates a Pacific Regional Office located in Oakland, California, as well as a California Desert Field Office located in Joshua Tree, CA.

30.     NPCA works to preserve and protect the National Park System and other protected federal lands with an ecological, management, or other nexus to National Parks. As part of this work, NPCA and its members advocated for, and participated in, the efforts to create the Mojave Trails National Monument and the Mojave National

Preserve.

31.   NPCA and its members are actively engaged in protecting the viewsheds, soundscapes, airsheds, watersheds, and other values that make Mojave Trails National Monument and Mojave National Preserve—places NPCA members use and enjoy—unique and worthy of protection for the American people.

32.   NPCA has been, is, and will continue to be adversely affected and irreparably injured by the Bureau of Land Management's decision to exempt the Northern Pipeline from required analyses under the NHPA and NEPA. The BLM's decision to apply a Class B exemption impermissibly narrowed the scope of the undertaking that should be reviewed, which adversely affects groundwater and environmental resources. This injury is both concrete and particularized.

33.   NPCA members have and will take personal and professional trips for hiking, birding, sight-seeing, and observing plants and wildlife to the Cadiz Dunes, Bonanza Spring, Historic Route 66, and other areas within Mojave Trails National Monument and the Mojave National Preserve that will be affected by the operation, maintenance, and/or modification of the Northern Pipeline.

34.   NPCA has been, is, and will continue to be required to divert its organizational resources to monitor the Northern Pipeline to ensure that the process delineated in the Protocol is followed, and that there is proper consultation before a decision is made to negatively impact lands with an ecological, management, or other nexus to National Parks. This injury is both concrete and particularized.

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

35.    NPCA has been, is, and will continue to be adversely affected and irreparably injured by the BLM's illegal determination that the Northern Pipeline may proceed through a categorical exclusion under NEPA. The interests of NPCA's members described above will be injured not only by the adverse impacts to plants and wildlife associated with operation, conversion, and maintenance of the Northern Pipeline, but also by the expected drawdown of the Fenner, Bristol, and Cadiz basins that will result from operation of the Cadiz Project. *See* Letter from Charlton H. Bonham, Dir., California Dep't of Fish and Wildlife, to Scott S. Slater, Chief Exec. Officer, Cadiz, Inc. 1, 6 (Dec. 4, 2018) (attached as Attachment 2); Letter from Stephanie R. Dubois, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Tom Barnes, Env't Sci. Assocs. 1-5 (Feb. 13, 2012) (attached as Attachment 3); Letter from Mary G. Martin, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Dirk Reed, Project Manager, Metropolitan Water Dist. 1-2 (Feb. 28, 2000) (attached as Attachment 4); Memorandum from James F. Devine, Senior Advisor for Sci. Applications, U.S. Geological Surv., to Molly S. Brady, Needles Field Manager, Bureau of Land Mgmt. 2 (Feb. 23, 2000) (finding Cadiz, Inc. overestimated the natural groundwater recharge to the basin by 5 to 25 times) (attached as Attachment 1). This injury is both concrete and particularized.

36.    NPCA members have visited freshwater springs near the Cadiz Project site, including Bonanza Spring, to observe rare plants and animals and find solace and renewal, and they intend to continue to do so in the future. NPCA's members derive professional, aesthetic, recreational, and educational enjoyment from the natural ecosystems

1    that these groundwater dependent desert springs and other riparian

2    areas support. These interests will be harmed by the drawdown of these

3    springs because NPCA members will no longer be able to observe these

4    natural ecosystems in their current abundance and vitality.

5        37.    NPCA's mission has been, is, and will continue to be

6    frustrated by the BLM's illegal determination that the Northern

7    Pipeline may proceed without required review under the NHPA. NPCA

8    has been, is, and will continue to be required to divert its organizational

9    resources to ensure that the Cadiz Project complies with federal law.

10       38.    Defendant **Debra Haaland** is the Secretary of the U.S.

11    Department of the Interior, and is sued in her official capacity as such.

12       39.    Defendant **Department of the Interior** is statutorily

13    charged with administration of the public lands under 43 U.S.C. §§

14    1701 *et seq.*

15       40.    Defendant **Bureau of Land Management** is the

16    administrative agency within the Department of the Interior

17    responsible for managing the public lands which surround the Cadiz

18    Project and underlie the right-of-way through which the Cadiz

19    Northern Pipeline is located.

20       41.    Defendant **Nada Wolff Culver** is a Senior Advisor to the

21    Secretary of the Interior, and according to the Department of the

22    Interior, Senior Advisor Culver is currently "exercising the delegated

23    authority of the BLM Director." Senior Advisor Culver is sued in her

24    official capacity.

25       42.    Defendant **Karen Mouritsen** is BLM's California State

26    Director, and is sued in her official capacity as such.

43.     Defendant **Andrew Archuleta** is the District Manager for BLM's California Desert District, and is sued in his official capacity as such.

44.     Defendant **Michael Ahrens** is the Field Manager for the BLM Needles Field Office, and is sued in his official capacity as such. Mr. Ahrens signed the BLM's right-of-way determination regarding the Cadiz Northern Pipeline.

## FACTUAL BACKGROUND

### 1. <u>The Cadiz Water Project</u>

45.     In 1983, the for-profit corporation Cadiz, Inc. purchased 11,000 acres of land in the Mojave Desert. Since this first purchase, Cadiz, Inc.'s property interest has grown to more than 35,000 acres in the Cadiz Valley.

46.     In 1998, Cadiz, Inc. began developing a water supply and storage project, the "Cadiz Groundwater Storage and Dry-Year Supply Program," which was ultimately thwarted when the Metropolitan Water District of Southern California declined to move forward with the project, citing potential environmental impacts as well as financial uncertainty. *See* Metropolitan Water District Board Meeting Minutes, October 8, 2002, http://www.mwdh2o.com/WhoWeAre/Board/Board-Meeting/Board%20Archives/2002/11-Nov/Minutes/003919530.pdf.

47.     In 2008, Cadiz, Inc. redesigned and relabeled its plans for a water supply and storage project, launching the Cadiz Project.

///

///

48.   As early as 2012, Cadiz expressly contemplated using the Northern Pipeline to fulfill the Cadiz Project's objectives. In a press release, Cadiz stated:

> The conversion of the Cadiz-Barstow segment to water transportation will create significant opportunities for the Company's Cadiz Valley Water Conservation, Recovery and Storage Project ("Water Project", "Project"). Once converted to water use, the pipeline can be used to directly connect the project area to northern and central California water sources during its second phase, serving a growing need for additional locations for storage south of the Bay Delta region. In addition, the pipeline would allow Cadiz to deliver water, either directly or via exchange, to potential customers in San Bernardino and Kern Counties, areas which do not currently have an interconnection point with the Project.

49.   The Northern Pipeline was also explicitly mentioned in a September 2012 California Environmental Impact Report ("2012 EIR") conducted for the Cadiz Project:

> Imported water for storage would be conveyed to the Fenner Gap area by pipeline from the CRA and, potentially, *an interconnection of the California Aqueduct to the Project through a converted natural gas pipeline.*

(emphasis added).

50.   More recently, on November 5, 2020, Cadiz, Inc. expressly discussed the Northern Pipeline in a filing with the SEC. When discussing the Northern Pipeline in its filing, Cadiz, Inc. stated:

> Initial feasibility studies indicated that, upon conversion, the 30-inch pipeline could transport between 18,000 and 30,000 acre-feet of water per year between the Water Project area and the Central and Northern California

water transportation network. As a result, this pipeline could diversify delivery opportunities for the Water Project and our broader water resource development efforts.

51.    Later in that same November 5, 2020 SEC filing—under a heading labeled "Northern Pipeline"—Cadiz, Inc. stated:

Professional water quality and structural testing of a five-mile segment of the pipeline has been conducted. The testing resulted in a determination that there were *no residual petroleum products in the tested segment* and that *the pipeline is structurally sound to transport water between Cadiz and Barstow.*

(emphasis added).

52.    A map of the Cadiz Project's pipelines—produced by Cadiz, Inc. —is included below:



///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

53.   When former-President Trump took office in 2017, the Cadiz Project became a priority for his new administration. In fact, according to a January 31, 2017, Cadiz, Inc. press release, the Cadiz Project was included in the Trump transition team's 50 high-priority infrastructure projects and attained a ranking of "number 15 on the administration's 'Emergency & National Security Projects' document." That priority list was designed to promote "shovel-ready" projects that would most benefit from a final regulatory push under a favorable agency evaluator. Press Release, Cadiz, Inc., Trump Transition's Infrastructure Priority List Includes So. Cal's Cadiz Water Conveyance Project (Jan. 31, 2017), https://www.cadizinc.com/2017/01/31/trump-transitions-infrastructure-priority-list-includes-so-cals-cadiz-water-conveyance-project/.

## 2.  **The NALC and NPCA Objections to the Northern Pipeline and the BLM's Response**

54.   On July 30, 2020, Cadiz Real Estate, LLC filed an SF-299 request with BLM seeking: (1) the assignment of approximately 64 miles of a right-of-way held by the El Paso Natural Gas Company permitting the operation and maintenance of an existing buried pipeline; and (2) an amendment under FLPMA to that right-of-way to allow for the conveyance of water rather than hydrocarbons.

55.   On November 19, 2020, BLM first began its categorical exclusion review of Cadiz Real Estate, LLC's Northern Pipeline right-of-way application.

56.   On or before December 3, 2020, BLM proposed using a B-8 exemption to preclude any further Section 106 review of the Northern Pipeline right-of-way application under the NHPA.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

57.   On December 10, 2020, the NALC and NPCA objected by letter to the BLM's proposed use of a NHPA B-8 exemption to exempt the Northern Pipeline right-of-way application from consultation and review under the NHPA. That exemption applies to the "issuance of permits, leases, and rights-of-way where no surface or resource disturbance is authorized, that have no potential for adverse effects, and that do not have the potential to affect access to or use of resources by American Indians." Protocol Appendix A, Class B Activity 8. The NALC and NPCA emphasized that their objection to the use of a NHPA B-8 exemption triggered formal public consultation with the State Historic Preservation Officer ("SHPO") under Section 8.1(P) of the Protocol. That objection also triggered consultation under Section 5.1(B) of the Protocol.

58.   On December 11, 2020, in signing DOI-BLM-CA-D090-2021-0005-CX, BLM officials categorically excluded the Northern Pipeline right-of-way application from further review under NEPA. In this document, BLM claimed the Northern Pipeline right-of-way was a "[g]rant of right-of-way wholly within the boundaries of other compatibly developed rights-of-way." Explaining that no extraordinary circumstances applied to the Northern Pipeline right-of-way precluding the application of a categorical exclusion, BLM impermissibly limited the scope of its analysis to only the impact of Northern Pipeline's operation and any associated construction or ground-disturbing activity. BLM failed to consider, without justification, the Cadiz Project and its impacts in the BLM's analysis.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

59.    This December 11, 2020 categorical exclusion document, DOI-BLM-CA-D090-2021-0005-CX, also references the NHPA. In that document, BLM stated that it was using the NHPA B-8 categorical exemption, and as such that no further Section 106 review of the Northern Pipeline right-of-way application was necessary. In so doing, BLM improperly determined the Northern Pipeline right-of-way grant had no "significant impacts on properties listed or eligible for listing, on the National Register of Historic Places," with respect to its NEPA review obligations under 43 C.F.R. § 46.215(g).

60.    On December 15, 2020, the SHPO emailed BLM, concerning the NALC and NPCA's letter objecting to the use of a Class B exemption. The SHPO specifically requested that BLM clarify the status of its consultation process.

61.    On the same date, BLM updated the status of its NEPA categorical exclusion for the Northern Pipeline, posting on the BLM National NEPA Register, under "National Historic Preservation Act Finding":

> Final Determination: Exempt Activity number B08, as defined in the 2019 State Protocol.
> Responsibilities under the National Historic Preservation Act for the proposed activity are complete.

62.    In a letter dated December 16, 2020, NPCA, Defenders of Wildlife, and the Center for Biological Diversity objected to the BLM's use of a NEPA categorical exclusion for the Northern Pipeline. In their letter, the organizations explained both the connection between the Northern Pipeline and the Cadiz Project, and why the presence of

1  extraordinary circumstances precluded the use of a categorical

2  exclusion. More specifically, the organizations explained that, at

3  minimum, five extraordinary circumstances under 43 C.F.R. § 46.215

4  precluded the BLM's use of a categorical exclusion, including that the

5  Northern Pipeline right-of-way grant was likely to:

> (b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas.
> (c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA section 102(2)(E)].
> (d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.
> (h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.
> (i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

21  63.    On December 17, 2020, the NALC and NPCA spoke by phone

22  with BLM Needles Field Office staff to discuss their objections to the

23  BLM's use of a Class B exemption under the Protocol. During that call,

24  BLM stated that it believed the application for the Northern Pipeline

25  was only for a water conveyance authorization, that was not associated

26  with the Cadiz Project. Therefore, BLM unilaterally concluded that the

NALC and NPCA's objection was "illegitimate" and so their objection did not require BLM to consult with the SHPO.

64.     That same day, the Advisory Council on Historic Preservation ("ACHP") emailed BLM officials to inform BLM that the ACHP was aware of the December 17 phone call between the NALC, NPCA, and BLM, and conveyed its concern that "BLM internally determined [the December 10] objection to be invalid and has stated its intention to proceed without SHPO consultation." The ACHP reminded BLM that "BLM [could not] proceed with completing its Section 106 review unless it receives agreement from the SHPO that it is appropriate to do so, or initiates consultation to determine how the Section 106 review will proceed."

65.     According to the SHPO's later January 8, 2021 letter, during a December 18, 2020 phone call between BLM and the Office of Historic Preservation ("OHP"), BLM again claimed that it did not consider the Northern Pipeline right-of-way application to be connected to the Cadiz Project. During that call, OHP requested BLM "consider and respond in writing to [OHP's] questions and the email of December 15, to include information about the proposed undertaking, discussion about the presence or absence of connected actions, and to clearly define what Section 106 compliance mechanism was being employed." OHP also "reminded BLM that there was an open consultation under the Protocol."

66.     On December 21, 2020, the BLM replied by letter to the NALC and NPCA December 10 objection letter. In that response BLM unilaterally dismissed the NALC and NPCA's objection, and BLM

reiterated its contention that it was "only evaluating whether to allow water to be transported in an existing pipeline." In further explaining the limited scope of its analysis, BLM asserted that the proposed right-of-way "has independent utility . . . and is not linked to the use of the groundwater under private lands held by Cadiz." In that December 21, 2020 letter, BLM also stated: "BLM California Desert District cultural resources staff recommended that the BLM comply with its Section 106 of the NPHA obligations for [the Northern Pipeline right-of-way grant] through the process identified in 36 CFR 800 and consistent with Stipulation 5.1(A) of the Protocol." BLM also erroneously claimed that: (1) the Northern Pipeline right-of-way "as proposed, has no potential to cause an adverse effect to historic properties, consistent with 36 CFR 800.3(a)(1)"; and (2) that BLM "has no further obligations under Section 106."

67.     That same day, December 21, 2020, BLM responded by letter to the SHPO by again unilaterally dismissing the NALC and NPCA's December 10 objections. BLM also reiterated its claim of "independent utility" and explained that the BLM California Desert District cultural resources staff had recommended meeting BLM's Section 106 obligations under the process identified in 36 C.F.R. § 800. Finally, BLM erroneously claimed that: (1) the Northern Pipeline right-of-way grant "as proposed, has no potential to cause an adverse effect to historic properties, consistent with 36 CFR 800.3(a)(1)"; and (2) that BLM "has no further obligations under Section 106."

68.     On December 21, 2020, and without concluding the required NHPA Section 106 consultation process, BLM issued a Title V FLPMA

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

Right-of-Way grant, serial number CACA-059050, to Cadiz Real Estate, LLC for the Northern Pipeline, purporting to permit "the pipeline to be used for transportation of water where no modifications, construction, or ground disturbing activities would be authorized." In addition, BLM executed the assignment of El Paso Gas Company's Mineral Leasing Act right-of-way to Cadiz Real Estate, LLC, serial number CACA-059168.

69.     Although BLM stated in its December 21, 2020, letter to the NALC and NPCA, and its December 21, 2020 letter to the SHPO that the Northern Pipeline "is not linked to the use of the groundwater under private lands held by Cadiz," Cadiz stated the following in its December 2020 Quarterly Newsletter:

> [W]e are pleased to now have these approvals in place, which allow us to execute on our longtime strategy of helping to add to the state's water conveyance network. Following these authorizations, Cadiz has acquired a significant pipeline asset already in the ground with *no prospect of causing substantial environmental disturbances to put it into use.*

(emphasis added).

70.     Following the BLM's issuance of the Northern Pipeline right-of-way grant, the SHPO and the ACHP both raised concerns about the BLM's compliance with the Protocol, and the BLM's NHPA review of the Northern Pipeline.

71.     On January 8, 2021, for example, the SHPO sent a letter to BLM regarding the Northern Pipeline FLPMA grant and requested that BLM: (1) clarify whether "BLM is rescinding the use of the Protocol for

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

this consultation"; (2) clarify whether the granting of the right-of-way to Cadiz has "the potential to cause effects on historic resources"; (3) "[c]larify under what circumstances BLM would consider further consultation obligation as per 36 CFR 800"; and (4) "[p]rovide documentation to support the BLM's determination that the [Northern Pipeline right-of-way grant] is not connected to any other undertaking."

72.     On January 14, 2021, the ACHP similarly raised concerns about the BLM's December 21, 2020 response to the SHPO. Specifically, the ACHP raised concerns about the BLM's claims of independent utility under the NHPA, and the BLM's lack of tribal consultation with respect to the Northern Pipeline right-of-way application. In the letter, the ACHP stated it was "not aware of any tribal consultation that occurred for [the Northern Pipeline] beyond a public notice posted on the BLM's e-Planning website," and did not know of "any consideration given to pausing deadlines to accommodate [the] limitations [resulting from COVID-19], despite sustained concern from tribes regarding [the Northern Pipeline] and its potential effect on lands and resources of significance to them." Moreover, the ACHP pointed out that:

> Even when Protocol exemptions are applied, it is a statutory requirement of the NHPA to consult with any Indian tribe that attaches religious and cultural significance to a historic property that may be affected by an undertaking. It is the responsibility of the BLM to consider whether it has met its statutory obligation to consult with Indian tribes for this undertaking.

73.     The ACHP also raised concerns about the BLM's unilateral conclusion that the NALC and NPCA's objection to the use of a Protocol

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

exemption was invalid "despite a written request from the SHPO to initiate consultation with its office."

74.     In that same letter, the ACHP requested additional clarification regarding the BLM's purported reliance on the process outlined under 36 C.F.R. § 800 instead of the Protocol after dismissing the NALC and NPCA's objection. The ACHP also explained that: "[a]lthough the BLM has the authority to follow the regulations rather than the Protocol process, it appears it may have done so in this case to circumvent the consultation process mandated under the Protocol."

75.     On February 11, 2021, BLM replied by letter to the ACHP and again stated that the Northern Pipeline right-of-way "only allows for the transportation of water where no modifications, construction, or ground disturbing activities are required." BLM attempted to justify its approval of the Northern Pipeline right-of-way by stating that "[d]etails of the eventual use of the [right-of-way] are not yet defined and will be considered in a separate decision at a later date." In that letter, BLM also stated it had used a B-8 categorical exemption under the Protocol. But, after receiving the NALC and NPCA's December 10, 2020 written objection, BLM removed the Northern Pipeline right-of-way from further consideration under the Protocol and determined "the NHPA Section 106 review as described at 36 CFR 800 [was] appropriate." The SHPO was copied on this response.

76.     BLM did not respond to the SHPO's request to clarify whether the Northern Pipeline right-of-way grant would have any effect on historic resources or clarify under what circumstances BLM would consider further consultation obligations per 36 C.F.R. § 800. Further,

BLM did not provide documentation supporting its contention that the Northern Pipeline was not connected to any other undertaking under the NHPA. Nor did BLM meaningfully explain its claims of independent utility, explain its unilateral—and thus improper—determination that the NALC and NPCA's December 10, 2020 objection was invalid, or respond to the ACHP's concerns about the BLM's lack of tribal consultation during its NHPA Section 106 review. BLM also did not address the ACHP's concerns about the BLM's decision to proceed under 36 C.F.R. § 800, instead of the Protocol, to avoid any further consultation responsibilities.

77.     To the best of Plaintiffs' knowledge and belief, BLM has yet to meaningfully respond to the ACHP's and the SHPO's concerns.

### 3. Cadiz Southern Pipeline Application and BLM Review

78.     As part of its scheme to mine and distribute billions of gallons of water annually from an ancient desert aquifer, Cadiz also separately plans to construct a 43-mile long, four-and-a-half to seven-foot diameter pipeline ("Southern Pipeline") connecting its property to the California River Aqueduct, near Rice, CA. That 43-mile water conveyance pipeline is to be buried within a right-of-way granted in 1910 to the predecessor of the Arizona and California railroad ("ARZC 1875 ROW"). In 2018, after BLM determined in 2017 that this pipeline fell within the scope of the ARZC 1875 ROW and required no additional FLPMA permit, NPCA and other conservation groups challenged the BLM's decision. *See* Final Rulings on Cross-Motions for Summary

Judgment, *Nat'l Parks Conservation Ass'n v. Zinke*, No. 2:18-cv-06775 (C.D. Cal Aug. 7, 2018) (No. 61). Ultimately, this Court granted Plaintiffs' motions for summary judgment and remanded the BLM's 2017 Determination that Cadiz's conveyance of water through that buried pipeline and associated railroad improvements were within the scope of the ARZC 1875 ROW. *Id.*

79.    On February 3, 2020, BLM reaffirmed its prior determination that the Cadiz Project's planned pipeline to the California River Aqueduct fell within the scope of the ARZC 1875 ROW, and that Cadiz, Inc. does not require any further approval associated with the pipeline proposed to be constructed within the ARZC 1875 ROW.

80.    On July 16, 2020, Cadiz Real Estate, LLC—14 days before submitting its Northern Pipeline right-of-way application—filed an SF-299 request with BLM seeking a new "easement" under FLPMA to construct a 41-foot pipeline to avoid an area where Cadiz contends the "ARZC alignment is not optimal."

81.    The California State Lands Commission sent a letter to Cadiz, Inc. on September 19, 2017 informing the company that the State Land Commission owned this sub-optimal strip of land, and that "a subsequent [state] EIR or its equivalent may be required to meet the California Environmental Quality Act requirements."

82.    In its Southern Pipeline SF-299 request, Cadiz Real Estate, LLC purports to rely on the 2012 EIR and the Cadiz Valley and Water Conservation, Recovery, and Storage Project June 2019 Addendum to the 2012 Environmental Impact Report ("2019 Addendum") to explain

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

the environmental impacts of the Southern Pipeline.

83.   Cadiz Real Estate, LLC failed, however, to inform BLM of: (1) more recent studies calling into question the impact of its proposed withdrawals from the aquifer; (2) the National Park Service's concerns about the project's impacts; (3) the USGS' previous statements that the Cadiz Project relies on groundwater modeling that is "not defensible"; or (4) the California Department of Fish and Wildlife's 2018 assessment that "new information indicates the [Cadiz] Project may cause significant effects not discussed or substantially more severe effects than shown in the Project EIR." Memorandum from James F. Devine, Senior Advisor for Sci. Applications, U.S. Geological Surv., to Molly S. Brady, Needles Field Manager, Bureau of Land Mgmt. 2 (Feb. 23, 2000) (finding Cadiz, Inc. overestimated the natural groundwater recharge to the basin by 5 to 25 times) (attached as Attachment 1); Letter from Charlton H. Bonham, Dir., California Dep't of Fish and Wildlife, to Scott S. Slater, Chief Exec. Officer, Cadiz, Inc. 1 (Dec. 4, 2018) (attached as Attachment 2); s*ee* Letter from Stephanie R. Dubois, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Tom Barnes, Env't Sci. Assocs. 1-5 (Feb. 13, 2012) (attached as Attachment 3); Letter from Mary G. Martin, Mojave Nat'l Pres. Superintendent, Nat'l Park Serv., to Dirk Reed, Project Manager, Metropolitan Water Dist. 1-2 (Feb. 28, 2000) (attached as Attachment 4).

84.   On January 12, 2021, as the change in administration loomed, BLM posted its preliminary finding of "No Historic Properties Affected" for the Southern Pipeline right-of-way application.

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

85.    Two days later, On January 14, 2021, the NALC and NPCA objected by letter to BLM's proposed use of a Class B exemption in the Protocol to preclude any further review under the NHPA for the Southern Pipeline right-of-way application.

86.    On January 20, 2021, President Joseph Biden took office.

87.    That same day, the Acting Secretary of the Interior, Scott de la Vega, issued a temporary suspension of the Department of the Interior's authority delegated to Department Bureaus and Offices—preventing BLM from granting "rights of way, easements, or any other conveyances of property or interests in property."

88.    On February 10, 2021, BLM responded to the NALC and NPCA's January 14 letter that objected to the use of an exemption under the Protocol to preclude further review of the Southern Pipeline. In its response, BLM stated:

> The [Southern Pipeline] ROW and associated facilities would facilitate Cadiz efforts to exercise their authorization by the County of San Bernardino to extract groundwater from their private land and transport it via pipeline, through the proposed 41-foot pipeline and into a pipeline owned by Cadiz on lands leased to Cadiz by the Arizona and California Railroad.

89.    In stark contrast to its approach to the Northern Pipeline right-of-way before the change in administration, BLM explained that it did not consider the Southern Pipeline right-of-way to be exempt under the Protocol and that potential impacts to cultural resources identified in the Cadiz Project's 2012 EIR and 2019 Addendum would inform the BLM's Section 106 review of the Southern Pipeline right-of-way

application. That is, BLM would review the entire Cadiz Project, not simply the 41-foot pipeline, for compliance with the NHPA. Additionally, BLM stated it did "not intend to finalize [its findings] until [BLM] ha[s] made a reasonable and good-faith effort to consult with affected tribes."

90.    Later in that same letter, BLM claimed that the Cadiz Project is not a connected action under NEPA, and the BLM's NEPA analysis, in contrast to Section 106 consultation under the NHPA, would be limited to the impact of the right-of-way and "the construction, operation, maintenance, and restoration of a water pipeline" on BLM-managed public lands.

91.    On or about March 21, 2021, NPCA, Defenders of Wildlife, Center for Biological Diversity, and Sierra Club submitted a letter objecting to the BLM's intention to use a categorical exclusion to grant the 41-foot FLPMA right-of-way for the Southern Pipeline. In that letter, the organizations pointed out that the BLM's own website makes it clear that the Southern Pipeline right-of-way grant is connected to the Cadiz Project, and that the grant would be "an irreversible and irretrievable commitment of resources that must be addressed in a robust NEPA review" per 42 U.S.C. § 4332(C)(v).

92.    Further, the March 21, 2021 letter raised concerns about the BLM's reliance on the previous CEQA environmental review, including the 2019 Addendum, in the Southern Pipeline approval process "because those documents did not adequately address the significant impacts of the [Cadiz] project on public lands resources" and "independent review by federal and state agencies and scientists of the

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1  hydrology have concluded Cadiz's CEQA documents are unreliable."
2  Their letter also explained that at least five extraordinary
3  circumstances under 43 C.F.R. § 46.215 are present that should
4  preclude BLM from using a categorical exclusion to grant the Southern
5  Pipeline right-of-way application without conducting a meaningful
6  NEPA review.

7      93.    Finally, the letter called for "a robust NHPA compliance,
8  including tribal consultation, to analyze the impacts, including direct,
9  indirect and cumulative, of the construction of the pipeline and the
10  groundwater mining activities that the pipeline will facilitate."

11      94.    To the best of Plaintiffs' knowledge, Cadiz Real Estate,
12  LLC's application for the Southern Pipeline right-of-way is still
13  pending.

14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1     **4. <u>Mojave Trails National Monument and Other Protected</u>**
2       <u>Areas Surrounding Cadiz</u>

3      95.     A BLM map of Mojave Trails National Monument is

4 reproduced below:



17      96.     The Cadiz Project site is located just south of Chambless,

18 approximately 16 miles south of the Mojave National Preserve and

19 approximately 28 miles north of Joshua Tree National Park. It is

20 situated on private land encompassed by the Mojave Trails National

21 Monument and is approximately three miles south of a recently

22 designated National Scenic Byway on the stretch of Historic Route 66

23 that runs from Needles to Barstow.

24      97.     The Cadiz Project would mine up to sixteen-billion gallons of

25 water per year from a desert aquifer that supports springs, seeps,

26 riparian areas, and wildlife within federal public lands with enhanced

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

statutory protections including the Mojave Trails National Monument, Mojave National Preserve, Joshua Tree National Park, and the California Desert Conservation Area ("CDCA").

98.     These enhanced statutory protections include the Park System Resource Protection Act and the National Landscape Conservation System Act ("NLCSA").

99.     The Park System Resource Protection Act directs the Secretary of the Interior to "undertake all necessary actions to—(A) prevent or minimize the destruction, loss of, or injury to System unit resources; or (B) minimize the imminent risk of destruction, loss, or injury to System unit resources." 54 U.S.C. § 100723(b)(1).

100.   The NLCSA places upon the Secretary additional obligations to manage the system "in a manner that protects the values for which the components of the system were designated." 16 U.S.C. § 7202(c)(2).

101.   On February 12, 2016, President Barack Obama established the Mojave Trails National Monument by presidential proclamation, pursuant to the Antiquities Act of 1906, 54 U.S.C. § 320301. Proclamation No. 9395, 81 Fed. Reg. 8,371 (February 12, 2016) (Establishment of the Mojave Trails National Monument). The Monument encompasses 1.6 million acres of federal land administered by BLM.

102.   The Proclamation describes Mojave Trails National Monument as "a stunning mosaic of rugged mountain ranges, ancient lava flows, and spectacular sand dunes." The Proclamation finds that the Monument is "an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists,

archaeologists, and historians for generations to come." The Proclamation concludes that "protection of the Mojave Trails area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans."

103. The Proclamation declares:

> [A]ll Federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, . . . other than by exchange that furthers the protective purposes of the monument or disposal for the limited purpose of providing materials for repairing or maintaining roads and bridges within the monument consistent with care and management of the objects identified . . . .

*Id.*

104. The Proclamation identifies various "objects" to be protected including geological, biological, ecological, historical, and paleontological resources. Specifically, the proclamation identifies:

> [T]he area's scarce springs and riparian areas such as Afton Canyon, Chuckwalla Spring, Hummingbird Spring, Barrel Spring, and Fenner Spring [which] provide refuges for a wide variety of plants and animals. The complex network of groundwater underlying the Mojave Trails area has been the subject of past and ongoing hydrological study. Underground aquifers feed springs and seeps that are important for sensitive

ecosystems and wildlife, though specific connections are
not yet well understood.

*Id.*

105.  The Proclamation recognizes the importance of maintaining
sufficient water resources to support the plants and animals that
inhabit these desert lands, and it requires the Secretary of the Interior
to "work with appropriate State officials to ensure the availability of
water resources, including groundwater resources, needed for
monument purposes." On information and belief, such consultation with
the appropriate State officials did not take place regarding the
Northern Pipeline application from Cadiz Real Estate, LLC.

106.  Since establishment of the Monument, studies have been
published that detail the complex aquifer underlying the Mojave Trails
National Monument and the springs and seeps fed by the aquifer. These
springs and seeps provide oases deep in the Mojave Desert which
wildlife and vegetation rely on to survive. For example, Bonanza
Spring—the largest year-round water source within a thousand square
miles, located within the Mojave Trails National Monument, and likely
to be affected by the Cadiz Project—supports abundant life such as
freshwater snails, tree frogs, desert bighorn sheep, mountain lions,
willow trees, and cottonwoods.

107.  These springs and seeps do not only provide support for the
flora and fauna of the Mojave Desert. Since time immemorial, the
springs and seeps fed by this aquifer have sustained human life and are
part of a sacred landscape. A cultural treasure—this landscape is found
through story, song, and ritual, including in the Salt Songs of the

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

Chemehuevi and Southern Paiute Tribes and in the Birdsongs of the Cahuilla Tribes. Indeed, the Presidential Proclamation discusses this cultural significance in establishing Mojave Trails National Monument. The Proclamation instructs: "The Secretary shall, to the maximum extent permitted by law and in consultation with Indian tribes, ensure the protection of Indian sacred sites and cultural sites in the monument . . . ." Proclamation No. 9395, 81 Fed. Reg. 8371 (February 12, 2016).

108.  The designation of Mojave Trails National Monument immediately codified enhanced protection for the identified "objects of historic or scientific interest" and for the land on which they are found. 54 U.S.C. § 320301(a). Once designated as a national monument, those lands must be managed for the purpose of preserving and safeguarding the objects of scientific and historic interest located there. The protection of the identified objects of historic or scientific interest is the paramount purpose for which the land is to be managed.

109.  Once a national monument has been established, it becomes part of the National Landscape Conservation System. 16 U.S.C. § 7202(b)(1)(A).

110.  Under the NLCSA, the Secretary has additional obligations to manage the system "in a manner that protects the values for which the components of the system were designated." 16 U.S.C. § 7202(c)(2).

111.  Additionally, after review by "subject-matter experts on historic preservation, design, cultural resources, and visual impacts, tourism and economic development, highway safety, federal lands, and Native American history and culture," the stretch of historic Route 66 running from Needles to Barstow that passes just north of the Cadiz

Project was designated a National Scenic Byway on February 16, 2021.
The accompanying Corridor Management Plan describes the natural
resources in the area as "nationally significant" and describes in detail
the surrounding protected lands and recreational and cultural resources
along this stretch of road.

112.   In its administration of federal lands surrounding the Cadiz
Project site, BLM must also comply with the Desert Renewable Energy
Conservation Plan Land Use Plan Amendment ("LUPA") to the CDCA
Plan. Under the LUPA, BLM seeks to "[c]onserve biological, physical,
cultural, social, and scenic resources." Bureau of Land Mgmt., Desert
Renewable Energy Conservation Plan: Executive Summary for the
Record of Decision for the Land Use Plan Amendment to the California
Desert Conservation Plan, Bishop Resource Management Plan, and
Bakersfield Resource Management Plan ES-2 (Sept. 2016). The LUPA's
objectives, among others, are to "[m]aintain natural surface- and
ground-water processes" and "[m]aintain hydrogeomorphic processes
that create habitat diversity" by "[p]rotect[ing] streams and washes,
wetlands, and seasonal wetlands in all watersheds in the planning
area." Bureau of Land Mgmt., Desert Renewable Energy Conservation
Plan Land Use Plan Amendment to the California Desert Conservation
Area Plan, Bishop Resource Management Plan, and Bakersfield
Resource Management Plan 71-72 (Sept. 2016). Additionally, under the
LUPA, the "primary goal for groundwater management is to maintain
safe yield conditions," *id.* at 84, and another objective is to "[a]void
groundwater withdrawals that have direct and indirect effects on
groundwater-dependent habitats," *id.* at 87.

## STATUTORY AND REGULATORY FRAMEWORK

1. <u>**Federal Land Policy and Management Act (43 U.S.C. §§ 1701 *et seq*.)**</u>

113.  FLPMA is a comprehensive statute designed to ensure that public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

114.  In passing FLPMA, Congress declared it to be the policy of the United States that: (1) "public lands be retained in Federal ownership"; (2) "public lands not previously designated for any specific use . . . be reviewed in accordance with the provisions of [the] Act"; (3) "judicial review of public land adjudication decisions be provided by law"; (4) "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values"; (5) "the United States receive fair market value of the use of the public lands and their resources"; and (6) "uniform procedures for any disposal of public land . . . be consistent with the prescribed mission of the department or agency involved." 43 U.S.C. § 1701(a)(1), (3), (6), (8)-(10).

115.  FLPMA prescribes multiple directives to the Secretary of the Interior including that the Secretary: (1) manage the public lands "through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate," 43 U.S.C. § 1732(b); (2) "take any action necessary to prevent unnecessary or undue degradation of the lands," 43 U.S.C. § 1732(b); (3) "prepare and

1  maintain on a continuing basis an inventory of all public lands and

2  their resource and other values," 43 U.S.C. § 1711(a); and (4) "ascertain

3  the boundaries of the public lands," 43 U.S.C. § 1711(b).

4    116.  FLPMA authorizes the Secretary of the Interior "to grant,

5  issue, or renew rights-of-way over, upon, under, or through" land

6  administered by BLM for, among other things, "pipelines . . . for the . . .

7  transportation or distribution of water." 43 U.S.C. § 1761 (a)(1).

8    117.  FLPMA provides that "no right-of-way for the purposes

9  listed in this subchapter shall be granted, issued, or renewed over,

10  upon, under, or through such lands except under and subject to the

11  provision, limitations, and conditions of this subchapter." 43 U.S.C. §

12  1770(a).

13    118.  FLPMA prohibits BLM from authorizing or allowing anyone

14  to construct or operate a water pipeline on federal public land within its

15  jurisdiction unless: (1) BLM grants a right-of-way in accordance with

16  the procedural and substantive provisions of FLPMA; or (2) the water

17  pipeline falls within the scope of a right-of-way granted by the United

18  States prior to FLPMA's enactment. *See* 43 U.S.C. § 1770(a).

19    119.  Regulations promulgated by the Secretary of the Interior

20  under FLPMA make clear that:

21    [An applicant] must have a grant under this part when
22    you plan to use public lands for systems or facilities over,
     under, on, or through public lands. These include, but are
23    not limited to . . . pipelines . . . and other systems which
24    impound, store, transport, or distribute water.

25  43 C.F.R. § 2801.9(a)(1).

26    120.  Prior to obtaining a right-of-way for a water pipeline under

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1  FLPMA, the applicant must submit substantial analysis, and the

2  Secretary of the Interior, acting through BLM, must make a number of

3  findings. For example, "prior to granting or issuing a right-of-way . . .

4  for a new project which may have a significant impact on the

5  environment," BLM "shall require the applicant to submit a plan for

6  construction, operation, and rehabilitation for such right-of-way which

7  shall comply with stipulations or with regulations issued by that

8  Secretary, including the terms and conditions required under section

9  1765 of this title." 43 U.S.C. § 1764(d).

10      121.  When granting rights-of-way, BLM is authorized to include

11  terms, conditions, and stipulations it determines to be in the public

12  interest, which may include modifying the proposed use or changing the

13  route or location of the proposed facilities. 43 C.F.R. § 2805.10(a)(1).

14      122.  Additionally, in order to protect "historical, scenic,

15  archeological, environmental, biological, cultural, scientific, educational,

16  recreational, and economic resources" in the California desert, Congress

17  established the 25-million-acre California Desert Conservation Area

18  ("CDCA"). 43 U.S.C. § 1781(a). Congress required the Secretary to

19  prepare a management plan for the CDCA which would account for

20  "maintenance of environmental quality [and] rights-of-way." 43 U.S.C. §

21  1781(d).

22      123.  The CDCA was subsequently amended by multiple other

23  regional planning endeavors, including the Northern and Eastern

24  Colorado Desert Coordinated Management Plan ("NECO Plan"), the

25  West Mojave Plan ("WEMO Plan"), and the Desert Renewable Energy

26  Conservation Plan ("DRECP") and its accompanying LUPA.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

124.   Under the DRECP, BLM must also comply with the groundwater Conservation Management Actions ("CMAs") including, but not limited to, the LUPA-SW-23. According to the LUPA-SW-23:

> A Water (Groundwater) Supply Assessment shall be prepared in conjunction with the activity's NEPA analysis and prior to an approval or authorization. This assessment must be approved by the BLM in coordination with USFWS, CDFW, and other agencies, as appropriate, prior to the development, extraction, injection, or consumptive use of any water resource. The purpose of the Water Supply Assessment is to determine whether over-use or over-draft conditions exist within the project basin(s), and whether the project creates or exacerbates these conditions. The Assessment shall include an evaluation of existing extractions, water rights, and management plans for the water supply in the basin(s) (i.e., cumulative impacts), and whether these cumulative impacts (including the proposed project) can maintain existing land uses as well as existing aquatic, riparian, and other water-dependent resources within the basin(s).

125.   In deciding whether to grant a right-of-way, BLM must comply with the existing land and resource management plans, including the CDCA Plan, as amended by the NECO Plan, the WEMO Plan, and the DRECP.

## 2. **National Historic Preservation Act (54 U.S.C. §§ 300101 _et seq._)**

126.   The NHPA was enacted by Congress to preserve historical sites as, "historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency." National Historic Preservation Act of 1966, Pub. L. No. 96–

515, sec. 101(a), § 1(b)(3), 94 Stat 2987. To accomplish this goal, the NHPA states that the Federal Government should "contribute to the preservation of non-federally owned prehistoric and historic resources and give maximum encouragement to organizations and individuals undertaking preservation by private means." 54 U.S.C. § 300101(4).

127.   The heads of Federal departments are required under the NHPA to "take into account" the effect of an undertaking on any "historic property." 54 U.S.C. § 306108. A "historic property" is defined as, "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register . . . ." 54 U.S.C. § 300308. Department heads must also provide a "reasonable opportunity" for the ACHP to comment on the undertaking. 54 U.S.C. § 306108. An undertaking is anything a Federal agency has discretionary decision-making authority to do or allow to be done. 54 U.S.C. § 300320.

128.   To comply with Section 306108, a Federal agency must not only consider the effects of a federal undertaking on historic resources it administers, but also consider the effects of the undertaking on historic properties located on state or private land. 36 C.F.R. § 800.5. The ACHP can "promulgate regulations as it considers necessary" to implement Section 306108. 54 U.S.C. § 304108. It does this by establishing national Programmatic Agreements.

129.   In order to meet its obligations under the NHPA, BLM developed a national Programmatic Agreement. That agreement was signed by BLM, the ACHP, and the National Conference of State Historic Preservation Officers. The agreement also defines how each

1  BLM State Office will work with its SHPO to protect and restore

2  historic properties and sites.

3      130.   The Protocol states in Section 1.1 that BLM and the SHPOs

4  "mutually agree" to meet their responsibilities under the NHPA

5  through the Protocol instead of following the procedure in 36 C.F.R. §

6  800.3 through 800.7 for "many undertakings."

7      131.   Unless limited by Section 8.1, or an agreement is reached

8  between both BLM and the SHPO, the Protocol applies to all "programs,

9  funding initiatives, actions or decisions under the statutory or

10  regulatory authority of BLM that, regardless of land ownership, may

11  affect historic properties." Protocol Section 1.2.

12      132.   The BLM Field Manager is required to consult formally with

13  the SHPO, "(a) in any situations that meet thresholds for SHPO review,

14  as defined in this Protocol (Stipulation 8.1); (b) when there is a finding

15  of an adverse effect to a historic property; and (c) in the event of

16  unresolved disagreement between the BLM [Cultural Resource] Staff

17  and the [Field Manager]." Protocol Section 2.2(B)(a)-(c).

18      133.   BLM is also required to solicit Tribal input during the

19  planning stages of an undertaking "through the public participation

20  opportunities afforded by the BLM's land use planning and NEPA

21  review processes, government-to-government consultation, and in the

22  development of BLM/Tribal protocol agreements," especially if there are

23  potential effects on culturally significant sites. Protocol Section 3.5; see

24  36 C.F.R. § 800.2(c)(2).

25      134.   If a Tribe has made it known to the BLM Field Manager that

26

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

they attach religious and cultural significance to a historic property that is subject to Section 106 review by the SHPO, BLM is required to seek "concurrence." Protocol Section 3.6. If the Tribe disagrees with the BLM's findings, it may, within a 30-day review period, specify the reasons for disagreeing with the finding and request the ACHP to review and object to the findings pursuant to 36 C.F.R. § 800.5(c)(2)(iii). *Id*.

135.   Though BLM Field Office Cultural Resource Staff may determine that any specific undertaking subsumed under the list of Class B undertakings qualifies as an exempt undertaking that does not need further review or consultation, there are exceptions. 5.1(B) of the Protocol specifically states:

> [S]hould an objection by the public arise to a Class B exempt undertaking prior to implementation, the Field Office shall consult with the objecting party and the SHPO for not more than 30 calendar days following receipt to resolve the objection. If the objection is resolved within this timeframe, the parties shall proceed in accordance with the terms of that resolution. If the objection cannot be resolved within this time frame, and the Field Office and the SHPO have not agreed to extend the consultation period, the Field Office shall submit the disputed exemption for review by the SHPO either under this Protocol or under 36 CFR § 800.

136.   Once there has been an objection to the use of a Class B exemption, BLM must consult with the SHPO to determine if the exemption is correctly applied. Protocol Section 5.1(b). If the review is governed by the C.F.R., then adverse effects would be analyzed by the

SHPO under 36 C.F.R. § 800.

137.   In addition to the exceptions in Section 5.1 that trigger SHPO review:

> The BLM shall initiate formal consultation with the SHPO in the following situations to determine whether or not to follow the procedures set forth in 36 CFR § 800 instead of continuing under the Protocol. In these threshold circumstances, the BLM and the SHPO may agree to continue proceeding under the Protocol if both parties agree that the details of a specific undertaking merit staying under the Protocol or if the BLM and SHPO agree to specific conditions that allow the review to stay under the Protocol.

138.   SHPO review is triggered if there is a written objection by a tribal group, or the public, to the application of a Class B exemption to an undertaking. Protocol Section 8.1(P).

139.   Additionally, under 36 C.F.R. § 800, the ACHP may elect to enter a specific Section 106 review in various circumstances, such as if there is a potential for procedural problems due to "substantial public controversy that is related to historic preservation issues." 36 C.F.R. § 800(c)(3), Appx. A.

140.   Finally, BLM erred in relying on the "independent utility" standard, commonplace in NEPA jurisprudence, in its NHPA Section 106 review analysis.

///

///

///

3. **National Environmental Policy Act (42 U.S.C. §§ 4321 _et_ _seq._)**

141.   NEPA is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). It "establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans." _Id_. NEPA regulations are "intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies." 40 C.F.R. § 1500.1(b).

142.   NEPA requires Federal agencies to prepare a "detailed statement"—an environmental impact statement (EIS)—for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must, in part, describe: (1) "the environmental impact of the proposed action"; (2) "any adverse environmental effects which cannot be avoided"; (3) "alternatives to the proposed action"; and (4) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C)(i)-(iii) , (v). The environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems),

aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b).

143.   NEPA implementing regulations define a "major federal action" as one "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

144.   NEPA implementing regulations further prescribe that:

> Federal actions tend to fall within one of the following categories: . . . . (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based. . . . (4) Approval of specific projects . . . [which] include actions approved by permit or *other regulatory decision* as well as federal and federally assisted activities.

40 C.F.R. § 1508.18(b)(2), (4) (emphasis added).

145.   The Department of the Interior Manual indicates that:

> An EIS level analysis should be completed when an action meets either of the two following criteria. (1) If the impacts of a proposed action are expected to be significant; or (2) In circumstances where a proposed action is directly related to another action(s), and cumulatively the effects of the actions taken together would be significant, even if the effects of the actions taken separately would not be significant.

Dep't of Interior, 516 DM 11, Departmental Manual, Chapter 11: Managing the NEPA Process--Bureau of Land Management, 11.8(A) (Dec. 10, 2020).

146.   The Department of the Interior Manual states that "[r]ights-

of-way for . . . pipelines" will normally require the preparation of an EIS. *Id*. at 11.8(B)(5)(b).

147.   Under the CEQ guidelines, agencies may also designate a list of actions that usually do not have a significant effect on the environment as categorical exclusions. 40 C.F.R. § 1508.4. Under its current guidelines, the Department of the Interior has a categorical exclusion for "[g]rants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way." Dep't of Interior, 516 DM 11, Departmental Manual, Chapter 11: Managing the NEPA Process--Bureau of Land Management, 11.9(E)(12) (Dec. 10, 2020).

148.   Where an agency designates an action as falling under a categorical exclusion, the agency must account for extraordinary circumstances where "a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. According to the procedure outlined in the Department of the Interior's Departmental Manual, Chapter 11: Managing the NEPA Process--Bureau of Land Management, the following extraordinary circumstances must be considered before an action is categorically excluded:

> (a) Have significant impacts on public health or safety.
> (b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas.
> (c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses

of available resources [NEPA section 102(2)(E)].

(d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

(e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

(f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

(g) Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau.

(h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

(i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

(j) Have a disproportionately high and adverse effect on low income or minority populations (EO 12898).

(k) Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (EO 13007).

(l) Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and EO 13112).

43 C.F.R. § 46.215(a)-(l).

149. Specifically, an agency is required to consider whether an action will "have significant impacts on properties listed or eligible for listing, on the National Register of Historic Places as determined by the

bureau." 43 C.F.R. § 46.215(g). When conducting its Section 106 review under the NHPA, BLM must evaluate the adverse effects on properties listed on the National Register of Historic Places, per 36 C.F.R. § 800.5. Thus, a full NHPA review serves to inform the BLM's determination as to the presence of this extraordinary circumstance.

150.  An informed review of extraordinary circumstances is of the utmost importance under NEPA as the BLM's own manual instructs: "If there is uncertainty about whether one or more of the extraordinary circumstances apply, we recommend that you prepare an EA to determine whether an EIS is required." Bureau of Land Mgmt., H-1790-1, National Environmental Policy Act Handbook 19 (2008).

151.  According to the BLM's Permanent Instruction Memorandum 2018-023, when conducting a NEPA analysis, the agency considers not just the action at hand, but also "connected actions." Bureau of Land Mgmt., PIM 2018-023, Analysis of Connected Actions under the National Environmental Policy Act (Sept. 9, 2018). The Permanent Instruction Memorandum states:

> Connected actions are those proposed Federal actions that are "closely related" and "should be discussed" in the same NEPA document (40 CFR 1508.25 (a)(1)). Proposed actions are connected if they automatically trigger other actions that may require an environmental impact statement; cannot or will not proceed unless other actions are taken previously or simultaneously; or if the actions are interdependent parts of a larger action and depend upon the larger action for their justification (40 CFR 1508.25 (a)(1)). Connected actions are limited to Federal actions that are currently proposed (ripe for decision). Actions that are not yet proposed are not connected

1
2
    actions but may need to be analyzed in the cumulative effects analysis if they are reasonably foreseeable.

3 *Id.*

4     152.  When assessing whether two actions are "connected actions"
5 under NEPA, a court may ask whether the projects have independent
6 utility. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir.
7 2006). Under the independent utility test, a court will ask "whether
8 'each of two projects would have taken place with or without the other
9 and thus [have] independent utility.'" *Id.* If a court finds that two
10 actions have independent utility, then a court will not consider them to
11 be "connected" under NEPA within the scoping outlined under 40 CFR §
12 1508.25. *Id.* at 968-69. To determine whether two projects have
13 independent utility, a court will look to whether each project is the but-
14 for cause of the other. *See id.* at 969.

15     153.  Non-federal actions, however, must be considered in a NEPA
16 review, as the BLM's Permanent Instruction Memorandum instructs:

17
18
19
20
21
22
23
24
    [I]f the non-Federal action or its effects can be prevented or modified by BLM decision-making, then the effects of the non-Federal action are properly considered indirect effects of the BLM action and must be analyzed as effects of the BLM action (40 CFR 1508.7, 40 CFR 1508.25(c)) (see section 6.8.2, Direct and Indirect Effects). *Effects of the non-Federal action that cannot be prevented or modified by BLM decision making may still need to be analyzed in the cumulative effects analysis for BLM action*, if they have a cumulative effect together with the effects of the BLM action (see section 6.8.3 Cumulative Effects).

25
26

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

Bureau of Land Mgmt., PIM 2018-023, Analysis of Connected Actions under the National Environmental Policy Act (Sept. 9, 2018) (emphasis added).

154. Under BLM's governing regulations, it is required to consider an action's relationship to "other actions with individually insignificant but cumulatively significant environmental effects" when engaged in its extraordinary circumstance analysis. 43 CFR § 46.215(f). When assessing these cumulative effects, BLM must consider both federal and non-federal actions. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013); *City of Burien v. Elwell*, 790 F. App'x 857, 859 (9th Cir. 2019). In this analysis, the agency is required to consider "reasonably foreseeable future actions." *City of Burien v. Elwell*, 790 F. App'x 857, 859 (9th Cir. 2019). "[P]rojects need not be finalized before they are reasonably foreseeable." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011).

**4. <u>Administrative Procedure Act (5 U.S.C. §§ 701–706)</u>**

155. The APA, 5 U.S.C. §§ 701-706, provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

156. An agency action is final if: (1) "the action mark[s] the consummation of the agency's decision making process[,]it must not be of a merely tentative or interlocutory nature; and (2) the action [is] one by which rights or obligations have been determined, or from which

1 legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78
2 (1997) (internal citations and quotations omitted).

3     157.  Under the APA, a reviewing court shall set aside agency
4 actions, findings, or conclusions when they are arbitrary, capricious, an
5 abuse of discretion, or otherwise not in accordance with law, or when
6 they are adopted "without observance of procedure required by law." 5
7 U.S.C. § 706(2)(A), (D).

8     158.  An agency action is arbitrary and capricious if the agency
9 "relied on factors which Congress has not intended it to consider,
10 entirely failed to consider an important aspect of the problem, offered
11 an explanation for its decision that runs counter to the evidence before
12 the agency," or if the agency's decision "is so implausible that it could
13 not be ascribed to a difference in view or the product of agency
14 expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
15 463 U.S. 29, 43 (1983). Moreover, "an agency changing its course" is
16 "obligated to supply a reasoned analysis for the change" beyond what
17 would be required if the agency were operating on a clean slate. *Id*. at
18 42.

19     159.  The APA also authorizes a reviewing court to compel agency
20 action that is unlawfully withheld. 5 U.S.C. § 706(1).

21   ///
22   ///
23   ///
24   ///
25   ///
26   ///

## PLAINTIFFS' CLAIMS FOR RELIEF

## <u>CLAIM 1 – VIOLATIONS OF NHPA (APA & NHPA)</u>

160.   Each allegation above is incorporated by reference as if fully set forth herein.

161.   This claim for relief challenges Defendant BLM's violations of the NHPA and its implementing regulations in granting a right-of-way for the Northern Pipeline. Defendant BLM's grant of a FLPMA Title V right-of-way to Cadiz Real Estate, LLC is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA. 5 U.S.C. § 704.

162.   The NALC and NPCA bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

163.   Section 106 of the NHPA requires Federal agencies to consider the effects on historic properties of projects they carry out, assist, fund, permit, license, or approve throughout the country. 36 C.F.R. § 800.16(y). If a federal or federally-assisted project has the potential to affect historic properties, a Section 106 review must take place. *Id*. at § 800.1(a).

164.   The Protocol provides the updated procedures by which the BLM will typically meet its NHPA Section 106 responsibilities in the state of California, to the satisfaction of the SHPO.

165.   Defendant BLM failed to conduct a full Section 106 review for the Northern Pipeline right-of-way application from Cadiz Real Estate, LLC, instead issuing an NHPA categorical exemption for "[i]ssuance of permits, leases, and rights-of-way where no surface or

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

resource disturbance is authorized, that have no potential for adverse effects, and that do not have the potential to affect access to or use of resources by American Indians." Protocol Appendix A, Class B Activity 8.

166. Defendant BLM justified its use of the B-8 categorical exemption asserting that that the Northern Pipeline right-of-way application was "not linked to the use of the groundwater under private lands held by Cadiz," and thus had "no potential to cause an adverse effect to historic properties."

167. When presented with the NALC and NPCA's formal objection to the use of an NHPA categorical exemption, BLM reiterated its previous justification, and deferred to the authority of 36 C.F.R. 800 as governing, rather than the Protocol previously relied upon, in order to conclude that BLM had "no further obligations under Section 106."

168. The NALC and NPCA objections to BLM's use of a categorical exemption triggered additional obligations under the Protocol regarding the Section 106 review process, including the requirement for consultation with the objecting parties and the SHPO to attempt to resolve the objection. In writings to BLM that went unanswered, the California SHPO and the ACHP raised several issues with the BLM's Section 106 compliance.

169. As the SHPO and the ACHP explained, BLM failed to: (1) provide adequate supporting documentation for its determination that the right-of-way was not linked to the Cadiz Project; (2) engage in adequate consultation with tribal entities; (3) come to a required agreement with the SHPO over resolution of the NALC's and NPCA's

objection, and any further Section 106 review; and (4) provide a reasoned explanation for its abrupt shift in process from the Protocol to 36 C.F.R. § 800 regulations, for the apparent purpose of avoiding further consultation necessitated under the Protocol.

170.   Defendant BLM violated the NHPA by failing to complete the necessary Section 106 review for the Northern Pipeline right-of-way application, ignoring the potential for adverse effects to historic properties that demonstrate that the use of a B-8 categorical exemption is erroneous. This misapplication of the exemption was based on the faulty assertion that the Northern Pipeline was "not linked to the use of the groundwater" by the Cadiz Project. Defendant BLM's assertion is inaccurate, unsupported, and contradicted by the facts. Defendants have therefore failed to provide adequate, reasonable, and sufficient justifications for their actions.

171.   Defendant BLM also failed to comply with its NHPA obligations through the numerous procedural issues identified by the SHPO and the ACHP, to which BLM failed to meaningfully respond.

172.   Defendant BLM has impermissibly "entirely failed to consider an important aspect of the problem," has "offered an explanation for its decision that runs counter to the evidence before the agency," and its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

173.   These failures on the part of Defendants constitute acts which are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law" within the meaning of the APA—exactly the type of "agency actions, findings, and conclusions" which the courts must "hold unlawful and set aside." 5 U.S.C. § 706(2)(A).

### CLAIM 2 – VIOLATIONS OF NEPA (APA & NEPA)

174.   Each allegation above is incorporated by reference as if fully set forth herein.

175.   This claim for relief challenges Defendant BLM's violations of NEPA and its implementing regulations in granting a right-of-way for the Northern Pipeline. Defendant BLM's grant of a FLPMA Title V right-of-way to Cadiz Real Estate, LLC is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA. 5 U.S.C. § 704.

176.   The NALC and NPCA bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

177.   NEPA requires Federal agencies to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment" 42 U.S.C. § 4332(C). An EIS must describe "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C)(v). NEPA implementing regulations list among federal actions the "[a]pproval of specific projects . . . [which] include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(4).

178.   Interior Department guidance states that EIS-level analysis should be completed "[i]n circumstances where a proposed action is

directly related to another action(s), and cumulatively the effects of the actions taken together would be significant, even if the effects of the actions taken separately would not be significant." Dep't of Interior, 516 DM 11, Departmental Manual, Chapter 11: Managing the NEPA Process--Bureau of Land Management, 11.8(A) (Dec. 10, 2020). The Interior Manual specifies that "[r]ights-of-way for . . . pipelines" will normally require the preparation of an EIS. *Id.* at 11.8(B)(5)(b).

179.  Defendant BLM did not conduct an EIS-level analysis of the Northern Pipeline right-of way application from Cadiz Real Estate, LLC, instead issuing a NEPA categorical exclusion for "[g]rants of right-of-way wholly within the boundary of other compatibly developed rights-of-way." *Id.* at 11.9(E)(12).

180.  In order to issue the E-12 categorical exclusion, BLM ignored the presence of at least five "extraordinary circumstances" related to the effects of the associated Cadiz Project: (1) "significant impacts on . . . natural resources"; (2) "highly controversial environmental effects"; (3) "highly uncertain . . . unique or unknown environmental risk"; (4) "significant impacts on . . . Endangered or Threatened Species"; and (5) "[v]iolat[ions of] a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment." 43 C.F.R. § 46.215(b)-(d), (h)-(i).

181.  In finding the circumstance contemplated by 43 C.F.R. § 46.215(i) was not present, Defendant BLM stated: "The FLPMA ROW conform [sic] to the CDCA, as amended . . . ." DOI-BLM-CA-D090-2021-0005-CX. However, Defendant BLM failed to meaningfully explain how the Northern Pipeline Title V FLMPA right-of-way-grant conforms with

the CDCA, as amended. The CDCA, as amended, includes the DRECP and its LUPA. Here, the Northern Pipeline and the associated Cadiz Project is contrary to the LUPA's objectives.

182.  Under the LUPA, Defendant BLM's objectives in managing the federal lands surrounding Cadiz, Inc. holdings include to (1) "[m]aintain natural surface- and ground-water processes"; (2) "[m]aintain hydrogeomorphic processes that create habitat diversity"; (3) and "[a]void groundwater withdrawals that have direct and indirect effects on groundwater-dependent habitats." Bureau of Land Mgmt., Desert Renewable Energy Conservation Plan Land Use Plan Amendment to the California Desert Conservation Area Plan, Bishop Resource Management Plan, and Bakersfield Resource Management Plan 71-72, 87 (Sept. 2016).

183.  Defendant BLM failed to provide sufficient grounds or explain the basis for its application of a categorical exclusion. In the December 11, 2020 document, DOI-BLM-CA-D090-2021-0005-CX, that approved the use of a categorical exclusion, BLM only addressed the Northern Pipeline FLPMA right-of-way's connection to the existing Mineral Leasing Act right-of-way. BLM failed to explain why the Northern Pipeline right-of-way was not connected to the Cadiz Project. In fact, BLM failed to make any mention of the Cadiz Project in that document.

184.  Defendant BLM conducted no analysis of cumulative effects as they relate to the Cadiz Project in its conclusion that no extraordinary circumstances were present, instead assessing the

1  cumulative effects only of the Northern Pipeline's connection to the

2  previously granted right-of-way under the Mineral Leasing Act.

3      185.   Defendant BLM violated NEPA by failing to conduct the

4  necessary EIS-level analysis for the Northern Pipeline right-of-way

5  application, ignoring the presence of extraordinary circumstances that

6  show the use of an E-12 categorical exclusion was erroneous. BLM's

7  misuse of this categorical exclusion was based on the faulty assertion

8  that the Northern Pipeline had no "direct relationship" to the Cadiz

9  Project or "other actions with individually insignificant, but

10  cumulatively significant, environmental effects." DOI-BLM-CA-D090-

11  2021-0005-CX. That assertion is inaccurate, unsupported, and

12  contradicted by the facts. BLM failed to mention the Cadiz Project in its

13  categorical exclusion approval for the Northern Pipeline right-of-

14  way application. Under the APA, Defendant BLM was required to

15  provide a reasoned explanation at the time of its decision and cannot

16  justify its determination with a post hoc rationalization. Defendants

17  have therefore failed to provide adequate, reasonable, and sufficient

18  justifications for their actions.

19      186.   Even under Defendants' self-imposed truncated analysis,

20  BLM unlawfully abandoned its NEPA obligation to properly assess the

21  Northern Pipeline's "direct relationship to other actions . . . with

22  cumulative significant environmental effects" regarding the Cadiz

23  Project, another listed extraordinary circumstance. 43 C.F.R. §

24  46.215(f).

25      187.   In the face of so many possible extraordinary circumstances,

26  even under the lenient analytical lens BLM sought to employ,

Defendants have an obligation to proceed with further environmental review of the Northern Pipeline right-of-way application, up to and including an EIS, all of which BLM failed to do.

188.  Defendant BLM has impermissibly "entirely failed to consider an important aspect of the problem," has "offered an explanation for its decision that runs counter to the evidence before the agency," and its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

189.  These failures on the part of Defendants constitute acts which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA—exactly the type of "agency actions, findings, and conclusions" which the courts must "hold unlawful and set aside." 5 U.S.C. § 706(2)(A).

## CLAIM 3 – VIOLATION OF FLPMA (APA & FLPMA)

190.  Each allegation above is incorporated by reference as if fully set forth herein.

191.  This claim for relief challenges Defendant BLM's violation of its stewardship obligations under FLPMA and its implementing regulations by granting a right-of-way for the Northern Pipeline. Defendant BLM's grant of a FLPMA Title V right-of-way to Cadiz Real Estate, LLC is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA. 5 U.S.C. § 704.

1   192.  The NALC and NPCA bring this claim pursuant to the

2   judicial review provisions of the APA, 5 U.S.C. § 706.

3   193.  FLPMA requires BLM to manage the lands within its

4   jurisdiction "in a manner that will protect the quality of scientific,

5   scenic, historic, ecological, environmental, air and atmospheric, water

6   resource, and archeological values." 43 U.S.C. § 1701(a)(8). Under this

7   obligation, BLM is prohibited from authorizing or allowing anyone to

8   construct or operate a water pipeline on federal public land under its

9   purview, unless newly requested rights-of-way are granted in

10  accordance with the procedural and substantive provisions of FLPMA.

11  43 U.S.C. § 1770(a).

12   194.  In evaluating such applications for rights-of-way under

13  FLPMA, BLM must account for the "maintenance of environmental

14  quality" as dictated by the management plan for the CDCA, in order to

15  protect the "historical, scenic, archeological, environmental, biological,

16  cultural, scientific, educational, recreational, and economic resources

17  that are uniquely located" in the California desert. 43 U.S.C. § 1781(a)-

18  (b).

19   195.  As previously stated, in managing the CDCA, Defendant

20  BLM must follow the LUPA approved on September 14, 2016. Under

21  the LUPA, Defendant BLM's objectives in managing this area include to

22  "maintain natural surface- and ground-water processes," "maintain

23  hydrogeomorphic processes that create habitat diversity," and "avoid

24  groundwater withdrawals that have direct and indirect effects on

25  groundwater-dependent habitats."

26

196.   Defendant BLM has failed to act in accordance with these stipulations under FLPMA, as demonstrated by its curtailment of the necessary NHPA and NEPA. BLM has failed to effectively explain its conclusions that a B-8 categorical exemption under the NHPA and an E-12 categorical exclusion under NEPA are appropriate, and failed to explain its assertions that there are no adverse impacts to ecological or cultural resources.

197.   A full review of the Cadiz Project's adverse effects as they relate to the Northern Pipeline is essential to ensure BLM meets its heightened responsibility for the protection of the quality of federal public lands, especially in the uniquely valuable and sensitive California desert environment.

198.   BLM's procedural and substantive violations of the NHPA and NEPA, along with their accompanying failure to provide adequate, reasonable, and sufficient justifications for their actions, vitiate the legitimacy of its FLMPA Title V right-of-way grant to Cadiz Real Estate, LLC. By allowing the Cadiz Project to proceed by these means, BLM has therefore failed to act in accordance with the law under FLPMA.

199.   Defendant BLM has impermissibly "entirely failed to consider an important aspect of the problem," has "offered an explanation for its decision that runs counter to the evidence before the agency," and its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

200.  These failures on the part of Defendants constitute acts which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA—exactly the type of "agency actions, findings, and conclusions" which the courts must "hold unlawful and set aside." 5 U.S.C. § 706(2)(A).

## REQUESTED RELIEF

WHEREFORE, the NALC and NPCA respectfully request that this Court:

1. Find and declare:

    A. BLM's grant of a Title V right-of-way to Cadiz Real Estate, LLC was arbitrary, capricious, an abuse of discretion, and contrary to law;

    B. BLM violated the NHPA by erroneously applying a B-8 categorical exemption, failing to conduct the necessary further review, and refusing to follow the proper procedure when formal objections to the exemption were raised;

    C. BLM violated NEPA by erroneously applying an E-12 categorical exclusion, ignoring the cumulative effects and the presence of other recognizable extraordinary circumstances, and failing to conduct the necessary further review; and

    D. BLM violated its stewardship obligations under FLPMA by inappropriately curtailing the review process, to reach a decision which contravenes its management objectives for the CDCA, as amended;

2. Vacate the BLM's grant of a right-of-way for the Northern Pipeline to Cadiz Real Estate, LLC and remand the matter to

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

BLM for further consideration consistent with applicable laws and regulations;

3. Enjoin BLM from authorizing or otherwise allowing any operation or modification of the Northern Pipeline for the transportation of water to proceed until BLM fully complies with the NHPA, NEPA, FLPMA, and all other applicable laws and regulations;

4. Award the NALC and NPCA their appropriate costs of litigation, including reasonable attorneys' fees and costs; and

5. Grant the NALC and NPCA such other or further relief as the Court may deem just and proper.

Dated: March 23, 2021.

Respectfully submitted,

___/s/ Michael Robinson-Dorn_
MICHAEL ROBINSON-DORN (CA Bar No. 159507)
UC IRVINE SCHOOL OF LAW
ENVIRONMENTAL LAW CLINIC
P.O. Box 5479
401 East Peltason Dr.
Irvine, CA 92616-5479
T: (949) 824-1043
E: mrobinson-dorn@law.uci.edu

*Counsel for Plaintiffs –*
*The Native American Land Conservancy &*
*National Parks Conservation Association*

* The following UCI Environmental Law
Clinic Certified Law Students contributed to the
drafting of this Complaint: Daniel B. Lammie,
Amber Norori, and Matthew E. Ramirez.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF